**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| ROY WILLIAMS, § § Plaintiff, § § v. § No. 3:09-CV-1651-M-(BF) § COMMISSIONER OF SOCIAL § SECURITY ADMINISTRATION, § § Defendant. § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Roy Williams ("Plaintiff") brings this action pursuant to section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g). He seeks review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for Title II and Title XVI benefits under 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

## I. BACKGROUND

*A. Procedural History*

On March 28, 2006, Plaintiff filed applications for Title II and Title XVI benefits, alleging a disability onset date of May 3, 2005. (Tr. 82-93.) The claims were denied initially on September 18, 2006 and upon reconsideration on February 14, 2007. (Tr. 40-43.) Plaintiff timely requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on April 28, 2008 in Dallas, Texas. (Tr. 10.) On May 29, 2008, the ALJ issued an unfavorable decision, finding that Plaintiff had not been under a disability from his date of onset through the date of the decision. (Tr. at 16.) Plaintiff requested and

was denied review of the ALJ's decision by the Appeals Council. (Tr. 1-6.) Plaintiff filed this case on September 3, 2009, seeking judicial review of the administrative proceedings. (Doc. 1.) This matter is ripe for consideration on the merits.

### B. Factual History

1. Plaintiff's Age, Education, and Work Experience

Plaintiff was born April 18, 1942. (Tr. 15.) Plaintiff completed two years of community college and also completed training as a nurse's aid. (Tr. 110.) His past relevant work includes security guard and laborer/warehouseman. (Tr. 112.) Plaintiff met the insured status requirement of the Act through December 31, 2010. (Tr. 12.)

2. Plaintiff's Relevant Medical Evidence

*Mental Impairments*

Plaintiff's medical records show that he was treated for depression and anxiety beginning in 2006 and continuing through the date of the decision. Veteran's Administration ("VA") treatment records show depressive symptoms in April 2006 and note that Plaintiff attempted suicide "years ago." (Tr. 284.) Williams was prescribed amitriptyline, an antidepressant, at that time. (Tr. 301.) In June 2006, Plaintiff reported that he was "going crazy" and "can't take it anymore." (Tr. 284.) Plaintiff was subsequently admitted to the VA psychiatric ward in July 2006 due to suicidal ideation. (Tr. 277.) Throughout the remainder of 2006, VA records document depressive symptoms, auditory and visual hallucinations, restricted or flat affect, and paranoia. (Tr. 215; 219; 239; 257; 258; 960; 962; 996-98; 1018.)

During this period, Plaintiff was diagnosed with major depressive order, depression with paranoia, and anxiety. (Tr. 193-96; 219; 1038; 1103.) Records note that

2

Plaintiff's depressive symptoms may limit his treatment for a brief drug relapse after the death of his wife. (Tr. 232-33.) The records also note that Plaintiff was fired from his previous job due to "attitude and poor performance." (Tr. 259.) Plaintiff was noted to have impaired judgment and be easily agitated by others; he was irritable and exhibited poor concentration and attention. (Tr. 967; 1103.) Plaintiff was prescribed amitriptyline (antidepressant), Wellbutrin (antidepressant), resperidone (antipsychotic), and trazodone (antidepressant/antianxiety). (Tr. 248; 255; 281; 961; 1020.) Medical records from 2007 and 2008 note continued hallucinations, anger control problems, and depression. (Tr. 1266; 1281; 1355.)

Notes from a consultative exam conducted by Dr. Fletcher in July of 2006 report that Williams has suffered from depression and anxiety since childhood and that he had childhood nosebleeds due to anxiety and poor temper control. (Tr. 186.) Dr. Fletcher also noted that Williams was verbose during the exam, with a depressed mood and tearful affect. (Tr. 186; 188.) Plaintiff also reported experiencing anxiety more days than not, muscle tension, avoiding behavior, irritability, sleep disturbance, and difficulty concentrating. (Tr. 186.) He reported depressive symptoms of tearfulness, irritability, social withdrawal, and disturbance of sleep, appetite, concentration and memory. (Tr. 186-87.) The report also notes auditory hallucinations. (Tr. 187.) Dr. Fletcher diagnosed Williams with major depressive disorder, recurrent and of moderate severity, generalized anxiety disorder, and bereavement over the loss of his spouse. (Tr. 189.) He assigned Plaintiff a Generalized Assessment of Functioning ("GAF") of 52.[1]

---

[1] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See Diagnostic and Statistical Manual of Mental Disorder DSM-IV (DSM)* 34 (4th ed., text revision 2000). The reporting of overall functioning occurs by the use of the GAF Scale, which is divided into ten ranges of

Dr. Parness performed an internal medicine consultative exam on August 22, 2006. (Tr. 765.) Dr. Parness noted Plaintiff has been "very" or "severely" depressed for over a year prior to the exam. (Tr. 765.) Williams stated "he has a lot of anger and wants to hurt somebody." (Tr. 765.) Dr. Parness noted that Plaintiff "wrinkles his face up and clenches his fist and appears to get quite angry" during the exam. (Tr. 765.) He also observed that Plaintiff appeared to hear voices and felt like people were talking about him. (Tr. 765.) Dr. Parness's impression was depression, rule out psychotic depression with paranoia, along with various physical disorders. (Tr. 765.)

On September 7, 2006, state agency physician, Dr. Reddy, completed a Psychiatric Review Technique. (Tr. 771.) Dr. Reddy assessed that Plaintiff suffers from the medically determinable impairments of major depressive disorder, generalized anxiety, and a history of substance abuse. (Tr. 774; 776; 779.) She also assessed mild functional limitations caused by depression and anxiety in Plaintiff's activities of daily living and in maintaining concentration, persistence, or pace. (T. 781.) Finally, she assessed moderate limitations in Plaintiff's ability to maintain social functioning. (Tr. 781.)

*Physical Impairments*

Plaintiff's medical records document treatment for various physical impairments including diabetes mellitus, neuropathy, foot infections, radiculopathy, arthritis, chest pain, cellulitis, blood clots, vision problems, obesity, and renal insufficiency. The records show diagnoses of uncontrolled diabetes with neurologic manifestations, high glucose

---

functioning – e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for oneself). *See id.* A GAF score of 52 indicates a "moderate" impairment in social occupational, or school functioning. *Id.*

labs, and high A1C labs beginning in 2000. (Tr. 190-99; 351; 433-48; 487; 659; 812-15; 1342.) Plaintiff started injectable insulin in 2000. (Tr. 463.) From 2000 through the date of the decision, Plaintiff experienced cellulitis, vision problems, neuropathy, nephropathy, pancreatitis, and foot ulcers due in whole or part to diabetic complications. (Tr. 463; 476-78; 495-96; 522; 673; 690-91; 699-700; 768.)

Dr. Parness's consultative exam notes that Plaintiff is in "poor" general health. (Tr. 766.) He reported lower extremity edema, scaling, onychomycosis, and onychogryphosis. (Tr. 768.) He further noted that Williams has poor heel to toe walking and poor pinprick and vibration sensation and reflexes in both feet. (Tr. 768.) Dr. Parness's impressions include diabetes mellitus, hypertension, neuropathy, nephropathy (progressive kidney disease), deep vein thrombosis, cellulitis with venous insufficiency, stasis dermatitis, tinea pedis, restless leg syndrome, esophoria (inward deviation of the eye), and radiculopathy. (Tr. 768.)

The VA medical records report the same conditions as found by Dr. Parness. (Tr. 800-09; 942.) A "Problem List" shows active conditions of chronic skin ulcers, keratoderma, diabetes mellitus with neurologic manifestations, and osteoarthritis. (Tr. 800-09; 942.) Other records show that Plaintiff suffers from skin ulcers, degenerative joint disease, atypical chest pain, venous thrombosis, cellulitis, and numbness of the right foot and toes. (Tr. 835; 886.) In 2008, Plaintiff suffered foot ulcers and restless leg syndrome. (Tr. 1266; 1384.) VA records also show that Plaintiff was prescribed cortisone shots and a brace for degenerative joint disease in his knees. (Tr. 1542; 1545.) Records also indicate a twenty percent disability rating due to problems with his feet and ankles. (Tr. 212.)

Plaintiff underwent an optical consultative exam in 2007. (Tr. 1229.) Pathology and fundoscopic findings include exotropia, cataract, and diabetic retinopathy with clinically significant macular edema. (Tr. 1229.) The examining doctor's prognosis is guarded because laser treatment may not be possible for Plaintiff's condition due to the location of the abnormalities. (Tr. 1230.) The doctor also noted that "macular edema is the most common cause of vision loss caused by diabetes." (Tr. 1230.)

Other diagnostic studies from 2007 reveal degenerative and arthritic changes in the lumbar spine, left hip, and knees. (Tr. 1246; 1376.) Radiographic studies of the knees show marked soft tissue swelling and narrowing of the joint compartment in the right knee. (Tr. 1246; 1376.) Marked narrowing of the joint compartments, degenerative changes, and "complete obliteration" of the medial join space was noted in the left knee. (Tr. 1376.) An exam in 2008 reported that Plaintiff walks slowly with an antalgic gait and a fifteen degree valgus deformity of the right leg at the knee. (Tr. 1245.) The examiner noted lumbar and hip tenderness and "arthritic appearing" knees. (Tr. 1245.) Plaintiff stated that his walking, sitting, and standing is limited to fifteen minute intervals. (Tr. 1245.) The examiner also reported that Plaintiff's conditions are caused by chronic, degenerative changes. (Tr. 1246.)

### 3. Plaintiff's Hearing

At the hearing on April 28, 2008, Plaintiff appeared with counsel and testified (Tr. 22.) He reported that he is currently living in disabled housing, which he described as assisted living. (Tr. 22-23.) It is wheelchair accessible and has nurses that assist him with his medications. (Tr. 23.) There are also people there that can help prepare meals, do laundry, and clean. (Tr. 23.) A friend helps him get his groceries. (Tr. 30.)

In September 2006, he was admitted to the VA hospital and subsequently placed in its domiciliary substance abuse program. (Tr. 24.) The initial program was five to six months long, but Plaintiff testified that he remained there until he could get into disabled housing. (Tr. 25-26.) He was discharged in January 2008 and has been sober for two years. (Tr. 26.)

Plaintiff testified that he cannot work due to diabetes and an inability to move his limbs. (Tr. 26.) He has a hard time keeping his diabetes under control (Tr. 38.) He has been on insulin since 1994 and has a lot of problems with lesions on his feet. (Tr. 31.) He gets dizzy and experiences excessive sweating. (Tr. 31.) He is unable to bend over or squat down, his knees give out, he has limited arm motion, his hand get numb and swell. (Tr. 27; 34.) He has neuropathy in his legs, feet, and hands. (Tr. 27.) He wears compression socks to help with his circulation and has special shoes. (Tr. 27.) He uses a cane to walk and can only stand for a period of ten to twenty minutes at a time. (Tr. 31-32.) It is almost impossible for him to climb stairs. (Tr. 33.) The sac underneath his left kneecap is "completely obliterated" and is very painful. (Tr. 34.) His right knee is also painful but is not as bad as the left. (Tr. 35.) He can sit for fifteen to twenty minutes before needing to get up due to pain caused by degenerative join disease in his lower back. (Tr. 32.) He must use both hand to push. (Tr. 33.) Although he is able to lift a gallon of milk, he usually uses both hands to lift things because occasionally his right hand gives out. (Tr. 33.)

He stated that he had suicidal thoughts while at the VA domiciliary program and was treated for depression. (Tr. 35; 38.) He takes medication for depression and anxiety. (Tr. 35; 37.) He has anger problems and gets upset easily. (Tr. 36.) He does not like being

7

around people and feels like people talk about him. (Tr. 37.) He has periods of low energy and low self esteem. (Tr. 37.)

He reported that he attends Bible Study every Wednesday and church services every Sunday. (Tr. 28.) To pass the time, he reads, sings, and watches television. (Tr. 29.)

### *C. The ALJ's Findings*

First, the ALJ found that Plaintiff last met the insured status requirements of the Act through December 31, 2010. (Tr. 12.) Second, the ALJ found that Plaintiff has not engaged in substantial gainful activity since May 3, 2005, the alleged onset date. (Tr. 12.) Third, he found that Plaintiff has the following severe impairments: Insulin Dependent Diabetes Mellitus, Diabetes Mellitus, and Left Lumbrosacral Radiculopathy. (Tr. 13.) Fourth, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix I of the Regulations. (Tr. 13.) Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform the full range of sedentary work. (Tr. 13.) In making this determination, the ALJ found the testimony of Plaintiff regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms not credible due to inconsistencies. (Tr. 15.) Sixth, the ALJ found that Plaintiff is not capable of performing past relevant work. (Tr. 15.) Seventh, he found that Plaintiff was a younger individual on the alleged onset date, has a high school education, and able to communicate in English. (Tr. 15.) Eighth, he found that transferability of job skills is not an issue. (Tr. 15.) Ninth, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, that there are jobs that exist in significant numbers in the national economy that the

Plaintiff can perform. (Tr. 15.) Finally, he found that Plaintiff was not under disability, as defined by the Act, from May 3, 2005 through the date of the decision. (Tr. 16.)

## II. ANALYSIS

### A. *Standard of Review*

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

> 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
>
> 2. An individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.
>
> 4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.
>
> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.*

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### B. Issues for Review

Plaintiff contends that: (1) the ALJ erred by failing to find Plaintiff's mental impairments, chest pain, and arthritis to be severe impairments; (2) the ALJ erred by applying a Medical Vocational Rule at Step 5; (3) substantial evidence does not support the ALJ's credibility assessment; and (4) substantial evidence does not support the ALJ's RFC determination. The Commissioner responds that: (1) the ALJ made a full and proper Step Two analysis of Plaintiff's impairments; (2) the ALJ properly used the Medical-Vocational Rules to find Plaintiff not disabled; (3) substantial evidence supports the

ALJ's credibility assessment; and (4) substantial evidence supports the ALJ's RFC determination.

*C. Analysis of the Severity of Impairments*

Plaintiff first argues that the ALJ should have found Plaintiff's mental impairments, chest pain, and arthritis to be severe impairments. He contends that the ALJ applied the wrong standard of severity and that, therefore, remand is required. In the alternative, he contends that even if the ALJ applied the right standard of severity, substantial evidence does not support the ALJ's determination.

The Regulations define a severe impairment as that which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). However, the Fifth Circuit found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Act. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). In *Stone*, the Fifth Circuit determined that an impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. *Id. Stone* provides no allowance for a minimal interference on a claimant's ability to work. *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009); *Sanders v. Astrue*, No. 3:07-CV-1827-G, 2008 WL 4211146, *7 (N.D. Tex. Sept. 12, 2008). The court must assume that the ALJ and Appeals Council have applied an incorrect standard at Step Two of the sequential evaluation process unless the correct standard is set forth by reference to Stone or another opinion of the same effect, or by an express statement that the ALJ or Appeals Council is using the construction the Fifth Circuit has imposed for what constitutes a severe impairment. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Stone*,

752 F.2d at 1106. Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, Plaintiff acknowledges that the ALJ cited to *Stone* in the "Applicable Law" section of the decision, but he contends that the ALJ failed to apply the correct standard in his Step Two analysis. In support of this contention, Plaintiff raises two arguments. First, he argues that the ALJ did not expressly cite or reference *Stone* in the analysis. There is no requirement that the ALJ specifically reiterate the *Stone* language in evaluating each of a claimant's impairments; therefore, Plaintiff's first argument is without merit. Second, Plaintiff argues that the ALJ stated that "the claimant's medically determinable mental impairment of depression does not cause more than minimal imitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere," which is incompatible with the standard set forth in *Stone*.

The Regulations provide that when evaluating a claimant's mental impairments, the Commissioner will make the following additional analysis:

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The Regulations further state that "if we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is *more than a minimal limitation in your ability to do basic work activities*." *Id.* (emphasis added). This language is directly in conflict with the standard required by the Fifth Circuit. *See Scroggins*, 598 F. Supp. 2d at 805. Therefore, if the ALJ relied on the language set forth in §§ 404.1520a and 416.920a when finding the Plaintiff's mental impairment to be not severe, the ALJ failed to use the correct standard and remand is required.

In his decision, the ALJ discussed each of the four functional areas, finding that Plaintiff had mild limitation in activities of daily living, no limitation in social functioning, mild limitation in concentration, persistence and pace, and no episodes of decompensation. The ALJ then concluded that "the claimant's medically determinable mental impairment of depression does not cause *more than minimal limitation in the claimant's ability to perform basic mental work activities* and is therefore nonsevere" (emphasis added). The explicit reference to the language found in §§ 404.1520a and 416.920a as the basis for finding Plaintiff's mental impairment not severe shows the ALJ used a standard of severity that is at odds with *Stone*. Therefore, remand is required.

Because the Court finds that the ALJ did not apply the standard of severity as set forth in Stone and therefore remand is required, it does not reach the remaining issues raised by Plaintiff.

## IV. RECOMMENDATION

For the foregoing reason, the Court recommends that the decision of the Commissioner be REVERSED and REMANDED.

SO RECOMMENDED, March 7, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a de novo determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).